# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

SAFEWAY TRANSIT LLC and
ALEKSEY SILENKO,

                    Plaintiffs,

v.

DISCOUNT PARTY BUS, INC., *an
inactive Minnesota corporation*,
PARTY BUS MN LLC, *a Minnesota
limited liability company*, and
ADAM FERNANDEZ,

                    Defendants.

Civil No. 15-3701 (JRT/HB)

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
ORDER FOR JUDGMENT**

---

Michael H. Frasier, **RUBRIC LEGAL LLC**, 233 Park Avenue South, Suite 205, Minneapolis, MN 55415, for plaintiffs.

Casey A. Kniser and Adam E. Szymanski, **PATTERSON THUENTE CHRISTENSEN PEDERSEN, PA**, 80 South Eighth Street, Suite 4800, Minneapolis, MN 55402, for defendants.

     The parties to this case are Twin Cities party bus proprietors. In September 2015, Plaintiff Safeway Transit LLC ("Safeway"), run by Plaintiff Aleksey Silenko, brought this trademark action against Defendants Discount Party Bus. Inc., and Party Bus MN LLC (collectively, "DPB"), owned by Defendant Adam Fernandez. Plaintiffs accuse Defendants of infringing the descriptive marks "RentMyPartyBus" and "952 Limo Bus." The Court conducted a bench trial on May 14, 2018, and the parties provided final written submissions on May 30, 2018. Having considered the evidence and arguments of counsel,

the Court now enters the following Findings of Fact, Conclusions of Law, and Order for Judgment, pursuant to Federal Rule of Civil Procedure 52(a)(1).

## FINDINGS OF FACT

1.     The Findings of Fact set forth herein are undisputed or have been proved by a preponderance of the evidence.

2.     To the extent the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

## I.     THE PARTIES

3.     Around 2000, Adam Fernandez started Party Bus MN – the first party-bus company in the Twin Cities region.  (Tr. 120:22-24, 174:22-177:2; *see* Exs. D6-D7.)[1]  In 2004, he formed Discount Party Bus Co., LLC, and in 2010, he converted it into Discount Party Bus, Inc.  (Tr. 119:22-120:1.)  He formed Party Bus MN LLC in 2014.  (Tr. 120:22-121:1.)  Fernandez is the sole owner, officer, and employee of both companies, which operate as a single entity.  (Tr. 119:10-21, 120:2-12.)  DPB markets its business at discountpartybus.com and discountpartybusmn.com.  (Tr. 124:11-125:4, 128:16-129:3.)

4.     In September 2008, Aleksey Silenko formed Party Bus MN LLC and changed its name to Safeway Transit LLC in October 2008.  (Tr. 13:22-14:25, 16:13-23; Exs. P1-P2.)  Safeway is a competing party bus company serving the Twin Cities region.

_____

[1] Citations to "Tr." refer to the transcript of the trial conducted on May 14, 2018.  (Tr. of Trial, May 22, 2018, Docket No. 117.)  Citations to "Ex." refer to trial exhibits.  (*See* Joint Ex. List, May 11, 2018, Docket No. 113.)

(Tr. 13:22-14:2.) Silenko is and has always been its director of business, responsible for budgeting, marketing, and operations. (Tr. 13:6-21.) Safeway operates the websites rentmypartybus.com and 952limobus.com. (Tr. 20:1-12, 38:1-11; Exs. P5, P11.)

## II. DPB'S PRIOR USAGE

**5.** DPB used "Party Bus MN" as a business name beginning no later than 2004. (Tr. 177:5-179:5; Exs. D6-D7.)

**6.** DPB used "Party Bus MN," "Rent My Party Bus," and "952 Limo Bus" in print advertising before 2008, including on fliers distributed by Fernandez.[2] (Tr. 183:19-185:1, 186:9-188:3; Exs. D11-D12.)

**7.** DPB did not use "Rent My Party Bus" or "952 Limo Bus" online before 2008.[3] (Tr. 139:15-18, 140:20-24.) Nor did DPB prove by a preponderance of the evidence that it used "Party Bus MN" online before 2008, although it may have. (*See* Tr. 15:1-16:4, 142:11-146:22; Exs. P35, D13.)

**8.** DPB stopped using the three terms no later than 2009 because Safeway began using them. (Tr. 72:13-22, 139:24-142:10.)

---

[2] Fernandez testified that DPB used "952 Limo Bus" in print advertising with Twin Cities Fun, but the 2004 and 2007 receipts in evidence are each for an "Online Listing Insertion Order," (Tr. 179:7-185:1, Exs. D1-D4), and the "952 Limo Bus" flier in evidence is undated. (Ex. D12.) As such, there is no documentary evidence proving that "952 Limo Bus" was used in print advertising before 2008. Despite this lack of corroboration, the Court credits Fernandez's testimony that the "952 Limo Bus" flier was used for print advertising before 2008.

[3] Although it appears that the 2004 and 2007 Twin Cities Fun receipts were for online advertising, Fernandez testified that DPB did not use the terms online before 2008.

## III.    SAFEWAY'S USAGE

**9.**    Safeway used "Rent My Party Bus" in print advertising beginning no later than 2009, including on fliers distributed by Silenko.  (Tr. 22:23-24:1, 28:19-31:7; Ex. P9.) Safeway used "952 Limo Bus" in print advertising beginning in 2013, including with Lavender magazine and on business cards distributed by drivers.  (Tr. 57:12-59:6, 67:23-70:15; Exs. P15, P18.)

**10.**    Safeway displayed a "Rent My Party Bus" decal on its first bus in 2008.  (Tr. 18:13-20; Ex. P3.)  Safeway displayed decals with one or more of the terms "Rent My Party Bus," "952 Limo Bus," and "Party Bus MN" on all its buses from 2008 to at least 2015.  (Tr. 48:12-51:11, 54:25-56:15, 65:12-67:22; Exs. P10, P14, P17.)

**11.**    Safeway registered the domain name partybusmn.com in September 2008, the domain name rentmypartybus.com in October 2008, and the domain name 952limobus.com in May 2011.  (Tr. 19:4-20:24, 38:4-21; Exs. P4-5, P11.)  Based on Silenko's testimony and Internet Archive captures of the websites from the period in question,[4] Safeway operated a website at rentmypartybus.com beginning no later than 2009, operated a website at partybusmn.com that forwarded visitors to the rentmypartybus.com site beginning no later than 2010, and operated a separate website at 952limobus.com beginning no later than 2013.  (*See* Tr. 19:20-25, 20:18-24, 38:20-24;

---

[4] The Court may take judicial notice of Internet Archive documents. *E. Coast Test Prep LLC v. Allnurses.com, Inc.*, – F. Supp. 3d –, 2018 WL 614732, at *11 (D. Minn. Jan. 29, 2018) (citing *Marten Transp., Ltd. v. Plattform Advert., Inc.*, No. 14-2464, 2016 WL 1718862, at *2-4 (D. Kan. Apr. 29, 2016) (collecting cases)); *see* Fed. R. Evid. 201(b)(2), 201(c)(1).

Wayback Machine, http://web.archive.org/web/*/www.partybusmn.com (last visited August 13, 2018); Wayback Machine, https://web.archive.org/web/*/www.rentmypartybus.com (last visited August 13, 2018); Wayback Machine, https://web.archive.org/web/* /www.952limobus.com (last visited August 13, 2018).)

**12.** Safeway began using the phone number 952-LIMO-BUS to market its "952 Limo Bus" brand beginning in 2011. (Tr. 36:9-37:23.)

**13.** Safeway used "Party Bus MN" and "Rent My Party Bus" for online advertising with Facebook beginning no later than 2011. (Tr. 21:11-22:22, 42:23-47:5; Exs. P6, P13.) Silenko testified that Safeway used the two terms for online advertising with Facebook and Google AdWords beginning in 2008 or 2009. (Tr. 25:17-26:7, 41:7-16.) Silenko further testified that Safeway spent "[m]aybe $10,000 a year" on Google AdWords in 2011 to promote the terms and that Safeway increased its budget for Google AdWords each year thereafter. (Tr. 41:7-16, 56:23-57:11.) Although unsupported by documentary evidence, the Court finds Silenko's testimony that Safeway advertised with Google generally credible. However, in light of documentary evidence showing that Safeway spent less than $10,000 on advertising with Facebook from 2011 to early 2015, (*see* Ex. P13), the Court finds Silenko's testimony that Safeway spent $10,000 per year advertising with Google not credible.

**14.** Safeway used "952 Limo Bus" for online advertising with Facebook beginning no later than 2013. (Tr. 39:2-21; *see* Ex. P12.) Silenko testified that Safeway used the term for online advertising with Facebook and Google AdWords beginning in

2011.  (Tr. 39:2-21.)  Although unsupported by documentary evidence, the Court finds this testimony generally credible given Safeway's other advertising.

15.    Safeway used "Party Bus MN" and "Rent My Party Bus" for Twitter accounts beginning no later than 2014.  (Tr. 27:1-28:18, Exs. P7, P8.)  Safeway did not prove by a preponderance of the evidence that it used the accounts before 2014.

16.    Safeway used "Rent My Party Bus" for online advertising with third-party websites, including The Knot and Wedding Wire, beginning no later than 2015.  (Tr. 59:7-62:2; Ex. P16.)  Safeway did not prove by a preponderance of the evidence that it used the terms for online advertising with third-party websites before 2015.

17.    Over time, Safeway's party-bus business got busy.  Its fleet grew from a single bus to 16 or 18 buses in 2015 – more than any of its Twin Cities competitors.  (Tr. 31:21-32:25, 54:1-24, 71:8-24.)  Silenko testified that Safeway's advertising led to steady growth in the number of people who "Like" and follow its Facebook pages and respond to its posts.  (Tr. 32:15-24, 47:16-48:1, 63:5-8.)  Although unsupported by documentary evidence, the Court finds this testimony generally credible given Safeway's growth.

## IV.    ALLEGED INFRINGEMENT

18.    In 2009, Safeway registered some or all of the domain names discountpartybus.com, discountpartybuses.com, and discountpartybusesmn.com, and had registered all three by 2014.  (*See* Tr. 111:10-15, 147:4-11.)  Silenko used discountpartybuses.com to advertise Safeway's services.  (Tr. 116:22-117:4.)

**19.**    From 2009 to 2014, DPB sent four cease-and-desist letters to Safeway regarding these three domain names.  (Tr. 147:4-11, 193:7-194:14.)  In March 2014, DPB sued Safeway and Silenko in state court.  (Tr. 75:23-76:22; Ex. P19.)  Neither the cease-and-desist letters nor the state-court action involved the rentmypartybus.com, 952limobus.com, or partybusmn.com domain names.  (Tr. 147:12-148:7.)  On April 30, 2014, the parties settled:  Safeway would transfer the DPB-related domain names in exchange for a release of liability.  (Tr. 76:23-77:23, 149:11-150:11; Ex. P20.)

**20.**    The next day – instructed by counsel – Fernandez formed Party Bus MN LLC, which in turn filed assumed name certificates for the names "Rent My Party Bus" and "952 Limo Bus."  (Tr. 194:15-195:3, Exs. P23-P25, D10.)

**21.**    In November 2014, Fernandez – through Party Bus MN LLC – filed for two Minnesota trademarks.  (*See* Tr. 194:15-195:3.)  First, he filed for the mark "952 Limo Bus," stating that the business first used the mark in 2006 and submitting for support Safeway's "952 Limo Bus" logo.  (Tr. 83:25-85:12, 141:10-19; Ex. P28.)  Second, he filed for the mark "PartyBusMN," stating that the business first used the mark in 2002 and submitting for support a copy of the DPB website with a "Party Bus MN" logo apparently superimposed over the top.  (Tr. 142:11-146:22; *see* Exs. D8-D9, D13.)  The two state registrations were cancelled in May 2016.  (*See* Tr. 3:24-4:1.)

**22.**    Contemporaneously, counsel for Fernandez's Party Bus MN LLC filed for two federal trademarks.  (*See* Tr. 195:11-14.)  First, counsel filed for the mark "Rent My Party Bus," stating that the business had used the mark since at least 2002 and submitting for support a specimen purportedly from DPB's website that was really from Safeway's.

(Ex. P26.)  Counsel subsequently filed an application for correction.  (*See* Tr. 3:17-23; Ex. D11.)  Second, counsel filed for the mark "952 Limo Bus," asserting an intent to use and later, by amendment, asserting use since at least 2004.  (Ex. P27.)  The two federal registrations were also cancelled in May 2016.  (Tr. 3:7-16.)  Fernandez testified that he did not register the marks to use them, but merely to stop Safeway from using them.  (Tr. 194:18-195:3, 201:15-21.)

23.     In May 2015, DPB hired a company named Internet Local Listings ("ILL") to improve its web presence.  (Tr. 135:19-137:17, 197:22-200:5; Ex. P32.)  ILL used ten keywords – including "952 Limo Bus" and "Rent My Party Bus" – for search engine optimization on Google Places.  (Ex. P32 at 1-2, 13.)  As a result, DPB launched a website at discountpartybussaintpaulmn.com that displayed the terms "952 Limo Bus" and "Rent My Party Bus" in multiple locations, including in page URLs, text, and hyperlinks.  (Tr. 86:8-91:9; Ex. P29.)  DPB also used the terms as hashtags in social media postings on both Facebook and Twitter.  (Tr. 91:10-100:23; Exs. P30-P31.)  Because Fernandez signed the contract with ILL, the Court finds that Fernandez and DPB intended to bolster DPB's placement in search results when users searched for the terms at issue, notwithstanding Fernandez's testimony that he did not read the contract, did not provide the keywords, and did not review the keywords.  (Tr. 202:18-207:15.)

24.     In August 2015, Fernandez filed complaints with ICANN – the organization responsible for managing domain names – alleging that he was the rightful owner of 952limobus.com and rentmypartybus.com and requesting that the domains be transferred to him.  (Tr. 77:24-85:24, 151:1-152:15; Exs. P21-P22.)

## V.    PROCEDURAL BACKGROUND

**25.**    On September 21, 2015, Safeway Transit and Aleksey Silenko brought this action against DPB and Fernandez, alleging Fraudulent Federal Registration, 15 U.S.C. § 1120 (Count 1); Cancellation or Assignment of Federal Registration, 15 U.S.C. § 1119 (Count 2); Federal Trademark Infringement, 15 U.S.C. § 1125(a) (Count 3); Cancellation of State Registration, Minn. Stat. § 333.25 (Count 4); Fraudulent State Registration, Minn. Stat. § 333.27 (Count 5); and Deceptive Trade Practices, Minn. Stat. § 325D.44 (Count 6). (Am. Compl. ¶¶ 54-82, Sep. 21, 2015, Docket No. 3.)   A month later, Safeway added a claim for Reverse Domain Hijacking, 15 U.S.C. § 1114(2)(D)(v) (Count 7).   (2d Am. Compl. ¶¶ 89-92, Oct. 15, 2015, Docket No. 8.)

**26.**    DPB and Fernandez filed their Answer on November 5, bringing a single counterclaim for Deceptive Trade Practices, Minn. Stat. § 325D.44, based on the theory that Safeway had been systematically passing off its own buses as DPB's.  (Answer, Nov. 5, 2015, Docket No. 9.)  Safeway moved to dismiss the counterclaim, arguing that it lacked particularity and that DPB relied on claims released in the state-court settlement.  (Mem. Supp. Mot. to Dismiss, Dec. 4, 2015, Docket No. 19.)  DPB filed an amended counterclaim. (Am. Answer, Jan. 8, 2016, Docket No. 28.)   Safeway filed another motion to dismiss. (Mem. Supp. 2d Mot. to Dismiss, Feb. 3, 2016, Docket No. 36.)  DPB subsequently filed for voluntary dismissal, and the counterclaim was dismissed without prejudice.  (*See* Dismissal Order, May 25, 2016, Docket No. 51.)

**27.**    Safeway moved for summary judgment on its claims for federal trademark infringement and reverse domain hijacking (Counts 3 and 7).  (*See* Mot. for Partial Summ.

J., Nov. 14, 2016, Docket No. 79.)  The Magistrate Judge held a hearing, (Minute Entry, Feb. 13, 2017, Docket No. 91), and issued a Report and Recommendation ("R&R") that Safeway's motion be denied because a material dispute of fact remained as to whether Safeway had established secondary meaning in the terms, (R&R, July 31, 2017, Docket No. 93).  Over Safeway's objections, the Court adopted the R&R and denied Safeway's motion for summary judgment.  (Mem. Op. & Order, Sept. 28, 2017, Docket No. 97.)

28.  Soon thereafter, the parties reached partial settlement, (Minute Entry, Nov. 3, 2017, Docket No. 100), and jointly requested a bench trial on the remaining issues. (Letter to District Judge, Nov. 27, 2017, Docket No. 101.)  The agreement was for Safeway to dismiss its claims related to registration of the trademarks and domain names in exchange for DPB withdrawing the registrations.  (Stipulation, June 6, 2018, Docket No. 125.)  Safeway's remaining claims for federal trademark infringement (Count 3) and state deceptive trade practices (Count 6) were tried to the Court on May 14, 2018.  (Minute Entry, May 14, 2018, Docket No. 114.)

## CONCLUSIONS OF LAW

Safeway alleges that DPB infringed two unregistered descriptive trademarks – "Rent My Party Bus" and "952 Limo Bus"[5] – in violation of the Lanham Act, 15 U.S.C. § 1125(a), and the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 333.25D.44,

---

[5] Although the Complaint also alleges infringement of Safeway's rights in the mark "Party Bus MN," Safeway did not advance this claim at trial.

and requests a permanent injunction, disgorgement of profits, and attorney fees. The Court

will find that DPB did infringe the marks but will grant only an injunction as relief.

## I.      TRADEMARK INFRINGEMENT

"A claim of trademark infringement under the Lanham Act requires ownership of a

valid trademark and a likelihood of confusion between the registered mark and the alleged

infringing use by the defendant." *Plasti Dip Int'l Inc. v. Rust-Oleum Brands Co.*, No. 14-

1831, 2014 WL 7183789, at *2 (D. Minn. Dec. 16, 2014) (citing 15 U.S.C. § 1125(a)). In

the context of trademark infringement, Safeway's state-law claim is coextensive with its

federal claim. *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 935-36 & n.3 (8th Cir. 2003)

(collecting cases).

### A.      Validity

To enforce a claim for infringement, a party claiming ownership of an unregistered

descriptive mark[6] must show that the mark acquired secondary meaning before the alleged

infringement occurred. *Co-Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.*, 780

F.2d 1324, 1330 (8th Cir. 1985). "Secondary meaning is an association formed in the minds

of the consumers between the mark and the source or origin of the product." *Id.* The party

claiming ownership "must show that by long and exclusive use in the sale of the user's

goods, the mark has become so associated in the public mind with such goods that the mark

serves to identify the source of the goods and to distinguish them from those of others."

---

[6] The parties agree that the marks at issue are descriptive.

*Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 870 (8th Cir. 1994). The user "need not show that consumers know their name," but does need to show "that consumers associate the [mark] with a single source," even if the source is anonymous. *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995).

### 1. Abandonment

As an initial matter, the Court must determine whether DPB is the senior user of the marks. *See Hana Fin., Inc. v. Hana Bank*, 135 S. Ct. 907, 909 (2015) ("Rights in a trademark are determined by the date of the mark's first use in commerce."). DPB used the marks first and continued to use them at least intermittently until 2009. As such, Safeway could not have begun to establish secondary meaning in the marks until 2009. But the limited evidence of DPB's use of the "952 Limo Bus" and "Rent My Party Bus" terms on fliers falls short of what is required to show that DPB established its own secondary meaning in the terms, particularly because they were not used as source identifiers but merely as slogans in a broader advertising campaign.

Moreover, under the Lanham Act, a registered mark is deemed abandoned "[w]hen its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. "Intent not to resume may be inferred from circumstances." *Id.*; *see Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.*, 720 F.2d 981, 983-84 (8th Cir. 1983). It is easy to draw such an inference here: Fernandez testified that DPB ceased use of the three terms in 2009 because Safeway began to use them and that he had no intent to resume use even when he registered them as marks in 2014. Therefore, the Court finds that DPB was not the senior

user of the marks during the alleged infringement period because it abandoned any rights it may have had in the three terms as marks no later than 2009.

## 2. Secondary Meaning

To determine whether a mark has acquired secondary meaning, courts examine evidence including "consumer surveys, deliberate copying of the mark, advertising featuring the [mark] at issue, expenditure on such advertising, and anecdotal evidence showing consumer identification of the [mark] with its source." *Stuart Hall*, 51 F.3d at 789. Additionally, "[l]ength and exclusivity of continuous use is a factor bearing on secondary meaning." *Id.* at 789-90. Because five years of "substantially exclusive and continuous use" is prima facie evidence of secondary meaning for registration under the Lanham Act, 15 U.S.C. § 1052(f), such use is likewise "a strong factor in favor of secondary meaning" underlying an infringement determination. *Stuart Hall*, 51 F.3d at 789 (applying *Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

DPB makes much of the fact that there is no direct evidence of secondary meaning, such as expert or consumer testimony or consumer surveys, in the record. But the absence of direct evidence is not determinative. "[I]n the absence of direct proof, the court must draw reasonable inferences from the evidence of money spent in advertising to establish that the mark is from a particular source, of the type of advertising used, of long-term usage of the mark, and of sales volume." *Heartland Bank v. Heartland Home Fin., Inc.*, 335 F.3d 810, 820 (8th Cir. 2003) (noting that there is often no direct proof).

Safeway began its continuous use of "Rent My Party Bus" in 2008 and of "952 Limo Bus" in 2011. Because of DPB's abandonment, Safeway's use of the terms was substantially exclusive from those years through the period of alleged infringement. This continuous and substantially exclusive use – six to seven years for "Rent My Party Bus" and three to four years for "952 Limo Bus" – cuts strongly in Safeway's favor.

Moreover, Safeway submitted significant evidence of its use of the terms in advertising. Safeway distributed thousands of printed fliers from 2009 onward and spent thousands of dollars on advertising with Google, Facebook, third-party wedding websites, and print media from 2011 onward. To show secondary meaning, "advertising must cause the public to equate the mark with the source of the product," and "[m]ore is needed to establish the necessary consumer association than merely the self-serving testimony of the plaintiff." *Co-Rect*, 780 F.2d at 1332-33. But here – unlike in *Co-Rect* – the terms at issue were not used merely as advertising slogans, but as business names. Safeway put the terms on its buses and used them in its domain names. These factors, combined with Safeway's advertising expenditures, Silenko's uncontroverted testimony about growing consumer engagement on Facebook and Twitter, and the exponential growth of Safeway's bus fleet, are sufficient to draw the inference that consumers associated the marks with Safeway.

Less convincingly, Safeway argues that DPB intentionally copied the terms. This factor ordinarily cuts strongly in favor of the party claiming ownership of a mark, but the impact is blunted here by evidence that Safeway took the terms from DPB in the first instance. DPB's abandonment made it possible for Safeway to establish secondary meaning in the terms, but the Court cannot countenance an argument that DPB's attempt

to reclaim the terms is proof that Safeway actually did so.  *Compare* Comment, *Lost, Mislaid, and Abandoned Property*, 8 Fordham L. Rev. 222 (1939) (tracing the Roman legal roots of the "finder's keepers" doctrine), *with* Leo Rosten, The Joys of Yiddish 81 (1968) (defining chutzpah as "that quality enshrined in a man who, having killed his mother and father, throws himself on the mercy of the court because he is an orphan").

The Court declined to grant summary judgment for Safeway because the existence of secondary meaning is a question ill-suited for summary judgment, *see First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040, 1046 (8th Cir 1996), and because Safeway provided few specifics to support its argument that consumers identified the marks with Safeway.  The Court now finds that Safeway provided enough additional evidence at trial to prove by a preponderance of the evidence that the "Rent My Party Bus" and "952 Limo Bus" marks acquired secondary meaning as a source identifier for Safeway's party bus services before the alleged infringement period.

## B.     Infringement

To show infringement, Safeway must prove that DPB (1) used the marks in commerce (2) in a way likely to cause confusion.  15 U.S.C. § 1125(a).

### 1.     Use in Commerce

In May 2015, DPB (through its contract with Internet Local Listings) launched a website at discountpartybussaintpaulmn.com that displayed the terms "952 Limo Bus" and "Rent My Party Bus."  DPB also used the terms in related social media postings on Facebook and Twitter.  DPB half-heartedly contends that these uses were minor because

they were not on DPB's main website, but the extent of the use is irrelevant to whether the use was in commerce.  Moreover, the website and social media postings were the product of DPB's contract with ILL for marketing DPB's website using the marks.  The Court finds that DPB used the marks in commerce.

### 2.    Likelihood of Confusion

In determining whether a likelihood of confusion exists, the court must consider the following factors: (1) the strength of the trademark owner's mark; (2) the similarity between the trademark owner's mark and the alleged infringing mark; (3) the degree to which the allegedly infringing services competes with the trademark owner's services; (4) the alleged infringer's intent to confuse the public; (5) the degree of care reasonably expected of potential customers; and (6) evidence of actual confusion."  *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011) (citing *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)).  "[N]o one factor controls, and because the inquiry is inherently case-specific, different factors may be entitled to more weight in different cases."  *Id.* (quoting *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1053 (8th Cir. 2005)).

As an initial matter, Safeway maintains its contention that DPB conceded that a likelihood of confusion exists through its admission that "concurrent use of the mark[s] by" both parties "is likely to cause confusion or mistake as to the origin, sponsorship, or approval of the parties' services."  (Ex. P33 at 1.)  But as both the Magistrate Judge and the Court endeavored to explain at summary judgment, this admission must be understood

in the context of DPB's legal position that it and not Safeway was the senior user of the terms at issue and that consumers associated the terms with DPB's services rather than Safeway's. (R&R at 28-29; Mem. Op. & Order at 7-8.) The fact that the Court now rejects DPB's position on ownership of the marks does not strip away the context of its previous admission. As such, the Court proceeds with the usual analysis.

The first five *SquirtCo* factors favor Safeway. First, although the marks are merely descriptive, the evidence supporting the Court's finding of secondary meaning also serves to prove that the marks are moderately strong within the Twin Cities. Second, the marks are identical. Third, the companies are direct competitors in the Twin Cities. Fourth, even though DPB used the terms first, the fact that Fernandez knew that Safeway's use of the terms was continuous and substantially exclusive suggests that he intended to confuse the public. Fifth, reasonable consumers cannot be expected to exercise a high degree of care in selecting party bus services over the internet. Only the sixth factor favors DPB: there is no evidence of actual confusion, and DPB's limited use of the marks nearby the term "Discount Party Bus" suggests that customer confusion, while likely, was nonetheless probably minimal. Nonetheless, considering all six *SquirtCo* factors, the Court finds that that DPB's use was likely to cause confusion.

### C. Personal Liability

"A corporate officer is personally liable for the corporation's trademark infringement if the officer participates in that infringement." *Microsoft Corp. v. Ion Techs. Corp.,* No. 01-1769, 2003 WL 21356084, at *5 (D. Minn. May 30, 2003). Fernandez is

and has always been the sole owner, manager, and employee of DPB, and he signed the contract with ILL that led to the infringing content. Thus, the Court finds that he is personally liable for DPB's infringement.

## II.    REMEDY

"[A]n injunction is the preferred Lanham Act remedy." *Minn. Pet Breeders, Inc. v. Schell & Kampeter, Inc.*, 41 F.3d 1242, 1247 (8th Cir. 1994); *see generally* McCarthy on Trademarks § 30:1. Under the Lanham Act, plaintiffs are also entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Finally, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." *Id.*

### A.    Injunction

Safeway seeks a permanent injunction barring DPB from using the two marks at issue. To obtain a permanent injunction, a plaintiff must show: "(1) its actual success on the merits; (2) that it faces irreparable harm; (3) that the harm to it outweighs any possible harm to others; and (4) that an injunction serves the public interest." *Cmty. of Christ Copyright Corp.*, 634 F.3d at 1012. First, Safeway succeeded on the merits. Second, Safeway has shown irreparable harm because, in trademark law, "injury is presumed once a likelihood of confusion has been established." *Id.* Third, because DPB never used the terms as its brand identity, abandoned them in 2009, and had no intent to resume use in commerce even when it registered the terms as marks in 2014, an injunction would not

harm DPB. Finally, the public has an interest in enforcement of valid trademarks. As such, the Court will grant Safeway's request for a permanent injunction.

## B.  Damages

Safeway also seeks an accounting of DPB's profits from the period of infringement. "[B]ecause the [Lanham] Act is grounded in equity and bars punitive remedies, 'an accounting will be denied in a trademark infringement action where an injunction will satisfy the equities of the case.'" *Minn. Pet Breeders*, 41 F.3d at 1247 (8th Cir. 1994) (quoting *Sweetarts v. Sunline, Inc.*, 436 F.2d 705, 711-12 (8th Cir. 1971)).

In cases of deliberate infringement, "an accounting of profits may be based upon 1) unjust enrichment, 2) damages, or 3) deterrence of a willful infringer." *Id.* (quoting *Banff, Ltd. v. Colberts, Inc.*, 996 F.2d 33, 35 (2d Cir. 1993)). Although proof of actual confusion is not always required, *see Masters v. UHS of Del., Inc.*, 631 F.3d 464, 474 (8th Cir. 2011), the Court's finding here – that confusion, while likely, was nonetheless probably minimal – strongly suggests there was no unjust enrichment or damages, and Safeway advances no evidence or argument to the contrary. Thus, the only justification for an accounting is deterrence of a willful infringer.

Setting aside the question whether DPB's infringement was willful,[7] there is no evidence suggesting that an injunction prohibiting use of the marks is insufficient to satisfy

---

[7] The Eighth Circuit has acknowledged a circuit split over whether willful infringement is a prerequisite for monetary relief given a 1999 amendment to the Lanham Act, assuming without deciding that it is. *Masters*, 631 F.3d at 471 n.2 (8th Cir. 2011). Because the Court will find that DPB does not need to be deterred, it also avoids reaching that issue.

the equities. To the contrary, the record – including Fernandez's testimony that his goal in registering the marks was to thwart Safeway from using them – suggests that Fernandez either genuinely thought the marks were his or simply sought to get even for Safeway's use of the DPB-related domains. Although the Court obviously cannot and does not condone such retaliation, it nonetheless concludes that an injunction is sufficient to deter DPB from future infringement of Safeway's marks.[8]

## C.      Attorney Fees

Finally, Safeway seeks an attorney fee award. "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Courts often apply the standard set out by the Supreme Court for the Patent Act, which contains the same provision. "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Mountain Mktg. Grp., LLC v. Heimerl & Lammers, LLC*, No. 14-846, 2016 WL 2901735, at *3 (D. Minn. May 18, 2016) (alteration in original) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014)); *cf. Cmty. of Christ*, 634 F.3d at 1013 (discussing the Eighth Circuit's pre-*Octane Fitness* standard). Factors include "frivolousness, motivation, objective unreasonableness (both in the factual and

---

[8] Moreover, even if an accounting was justified here, Safeway's request for disgorgement of all DPB's profits from the period of infringement is overbroad given the statute's command that damages "shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a).

legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Octane Fitness*, 134 S. Ct. at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).

On one hand, the Court cannot condone DPB's vigilante attempt to wrest control of the marks from Safeway. On the other, the Court cannot conclude that Fernandez deliberately acted unlawfully given the Court's factual finding that DPB used the terms first. Fernandez testified that it was his understanding that he was entitled to resume use of the marks. Even if that conclusion was not the result of sound legal advice, the Court finds it a plausible explanation of the infringement. Moreover, the totality of the circumstances surrounding this case shows that Safeway is not an innocent actor. Because this inquiry is equitable by nature, Safeway's own bad acts may not pass without comment. For all these reasons, the Court declines to find this case exceptional and will deny Safeway's request for an award of attorney fees.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants' oral motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c) is **DENIED**.

2.     Judgment shall be entered in favor of Plaintiffs and against Defendants on Plaintiffs' remaining claims (Counts 3 and 6).

3.     Plaintiffs' request for a permanent injunction is **GRANTED**.  Defendants Discount Party Bus, Inc., Party Bus MN LLC, and Adam Fernandez, and all other persons who are in active concert or participation with Defendants Discount Party Bus, Inc., Party Bus MN LLC, and Adam Fernandez are hereby **PERMANENTLY ENJOINED** from using or contributing to the use of the "Rent My Party Bus" and "952 Limo Bus" trademarks or related domain names, keywords, or hashtags in connection with the advertisement, marketing, or sale of transportation services.

4.     Plaintiffs' request for an accounting of profits is **DENIED**.

5.     Plaintiffs' request for attorney fees is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:  August 13, 2018         _____s/John R. Tunheim_____
at Minneapolis, Minnesota.          JOHN R. TUNHEIM
                                    Chief Judge
                 United States District Court